**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| LAURA BOUSTANI, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:06-cv-02065 |
| FRANK LAROSE, in his official capacity as Ohio Secretary of State, | |
| *Defendant*. | |

**REPLY IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION TO ENFORCE THE JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION TO DISSOLVE**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 1

I.    The Secretary Knew About This Court's Injunction and Chose to Defy It............................ 1

II.   The Secretary's Request to Dissolve This Court's Permanent Injunction Is Improper and Should Be Rejected.......................................................................................................... 2

   A.   The Secretary's motion is untimely. .............................................................................. 2

   B.   The Secretary has failed to meet his burden to show that continued enforcement of the injunction is inequitable.......................................................................................................... 3

       1.   No change in Ohio law supports the injunction's dissolution. ....................................... 4

       *2.*   Neither Revised Form 10-U nor the Secretary's guidance to election officials provides any assurance against the abuses this Court's injunction sought to prevent........................... 9

       3.   All equitable considerations weigh strongly *against* dissolving the injunction, especially now............................................................................................................................. 14

CONCLUSION..................................................................................................................... 15

'

**TABLE OF AUTHORITIES**

**Cases**

*Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville & Davidson County*,
    466 F.3d 391 (6th Cir. 2006) ................................................................................... 4, 5

*Gooch v. Life Investors Insurance Co. of America*,
    672 F.3d 402 (6th Cir. 2012) ...................................................................................... 4

*National Labor Relations Board v. Bannum, Inc.*,
    93 F.4th 973 (6th Cir. 2024) ................................................................................... 1, 2

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) ...................................................................................................... 15

*Sweeton v. Brown*,
    27 F.3d 1162 (6th Cir. 1994) ...................................................................................... 4

*United States v. Pauley*,
    321 F.3d 578 (6th Cir. 2003) ............................................................................. 1, 2, 14

*Waifersong, Ltd. Inc. v. Classic Music Vending*,
    976 F.2d 290 (6th Cir. 1992) .................................................................................... 15


**Constitutional Provisions and Statutes**

Ohio Constitution, Art. V, § 1 ......................................................................................... 5

Ohio Revised Code § 3501.01 ..................................................................................... 6, 7

Ohio Revised Code § 3503.03 ......................................................................................... 5

Ohio Revised Code § 3505.18 ......................................................................................... 6

Ohio Revised Code § 3505.20 ................................................................................... 12, 13

Ohio Revised Code § 3599.12 ......................................................................................... 6

Ohio Revised Code § 4507.09 ......................................................................................... 6

Ohio Revised Code § 4507.13 ......................................................................................... 6


**Rules**

Federal Rule of Civil Procedure 60(b) ......................................................................... 1, 2

Federal Rule of Civil Procedure 60(c) ............................................................................. 2


**Other Authorities**

Letter from Freda Levenson et al. to Secretary LaRose (Oct. 17, 2024),
    https://perma.cc/P54N-UZLQ ..................................................................................... 7

Letter from Secretary LaRose to Honorables Huffman & Stephens (Aug. 29, 2024),
    https://perma.cc/4XKM-M4BN ..................................................................................... 5

Ohio Attorney General, *Grand Juries Indict 6 for Illegal Voting* (Oct. 22, 2024),
https://www.ohioattorneygeneral.gov/Media/News-Releases/October-2024/
Grand-Juries-Indict-6-for-Illegal-Voting ............................................................ 9

Ohio Legislative Services Commission, *Article V, Section 1*,
https://codes.ohio.gov/ohio-constitution/section-5.1 ...................................... 3

Ohio Legislature, House Bill 458,
https://www.legislature.ohio.gov/legislation/134/hb458 .............................. 3

Ohio Sec'y of State, *Identification Requirements*,
https://www.ohiosos.gov/elections/voters/id-requirements/ ...................... 7

Ohio Secretary of State, *2023 Ohio Election Calendar*,
https://www.ohiosos.gov/globalassets/publications/election/
2023electionscalendar_11x17.pdf ................................................................ 3

Ohio Secretary of State, *2024 Ohio Election Calendar*,
https://www.ohiosos.gov/globalassets/publications/election/
2024electionscalendar_11x17.pdf ................................................................ 3

Ohio Secretary of State, *Election Results and Data*,
https://www.ohiosos.gov/elections/election-results-and-data/ .................. 9

Ohio Secretary of State, *Secretary LaRose Calls for Legislative Authority to Require
Proof of Citizenship for Voter Registration* (Aug. 29, 2024),
https://www.ohiosos.gov/media-center/press-releases/2024/2024-08-29/ ............... 5

Ohio Secretary of State, *Secretary LaRose Certifies Results of the 2024
Primary Election* (Apr. 19, 2024),
https://www.ohiosos.gov/media-center/press-releases/2024/2024-04-19a/ .............. 8

Ohio Secretary of State, *Voter Registration and Information Update Form*,
https://www.ohiosos.gov/globalassets/elections/forms/vr_form_english.pdf ........... 13

## INTRODUCTION

The Secretary's opposition makes clear that he knew of this Court's injunction and that, after decades of compliance by his office, he decided abruptly to flout it on the eve of the election and without notifying either this Court or Plaintiffs. *See generally* ECF No. 66 ("Opp."). Now, one week before Election Day, *after* getting caught violating the injunction, he asks this Court to dissolve it, citing Federal Rule of Civil Procedure 60(b)(5). "[D]istrict courts should not use their authority under Rule 60(b) to reward parties' contempt of prior orders." *United States v. Pauley*, 321 F.3d 578, 581 (6th Cir. 2003). The Secretary's eleventh-hour motion is improper and does not come close to establishing circumstances that would merit dissolving the injunction, especially this close to Election Day. This Court should compel the Secretary to comply with its injunction.

## ARGUMENT

### I.   The Secretary Knew About This Court's Injunction and Chose to Defy It.

Less than a week before early voting began, the Secretary reimplemented the exact questions and demand for proof of citizenship that this Court enjoined in October 2006. Opp. at 4, 7. He does not dispute that his reintroduction of the enjoined text into Revised Form 10-U violates this Court's injunction. Nor does he claim that he lacked knowledge of the injunction, or that continued compliance was impossible. To the contrary, the Secretary acknowledges that he reintroduced the very same questions and proof-of-citizenship requirement in Revised Form 10-U that he was enjoined from enforcing, ECF No. 53 at PageID 531, and circulated Revised Form 10-U to boards of elections for use just days before early voting was set to begin in Ohio.

The Secretary cannot evade civil contempt by arguing that his violation of this Court's injunction is defensible or justified. *Nat'l Lab. Rels. Bd. v. Bannum, Inc.*, 93 F.4th 973, 980–82 (6th Cir. 2024). The purpose of civil contempt proceedings is "for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant

1

for losses sustained." *Id.* at 981 (citation omitted). If either or both purposes are present, the Secretary may be found in contempt. *See id.* at 981–82. Whether the Secretary may believe his actions are justified does not factor into the civil contempt analysis: the relevant fact is that he has and "continues to evade its obligations" under this Court's order and judgment. *See id.*

Because Plaintiffs have demonstrated that the Secretary is knowingly defying the terms of this Court's order, and the Secretary has not tried to rebut their *prima facie* case, this Court should find the Secretary is in contempt and order him to comply.

## II.  The Secretary's Request to Dissolve This Court's Permanent Injunction Is Improper and Should Be Rejected.

The Secretary has made no effort to disabuse this Court of the fact that he has been violating this Court's injunction for weeks—or that, worse, he did so surreptitiously. Only now that he has been caught violating the injunction does he ask this Court to dissolve it. His untimely and meritless request fails many times over.

### A.  The Secretary's motion is untimely.

Federal Rule of Civil Procedure 60(b) governs federal courts' authority to "relieve a party or its legal representative from a final judgment, order, or proceeding." Fed. R. Civ. P. 60(b). Under that rule's plain text, this Court may relieve a party of an order only "on motion" for such relief. *See id.*; *Pauley*, 321 F.3d at 581. And a motion for Rule 60(b) relief "must be made within a reasonable time." Fed. R. Civ. P. 60(c).

The Secretary's request for dissolution of the permanent injunction is untimely and improper. To state the obvious, the reasonable time to file such a motion is *before* acting contrary to an existing injunction. Instead, the Secretary waited to file his "motion to dissolve the permanent injunction" as part of the papers this Court ordered him to file in response to Plaintiffs' emergency motion—24 days after he began actively violating this Court's order, and two days after getting

caught. ECF No. 66 at PageID 580.

None of the Secretary's post hoc rationalizations justify his delay. As addressed in more detail below, the Secretary incorrectly asserts that his defiance of the injunction was somehow necessary to effectuate Ohio law, *see* Opp. at 7–9, citing the passage of an amendment to the Ohio Constitution in 2022, and the passage of Ohio H.B. 458, which took effect on April 7, 2023.[1] But even if the Secretary's position had any validity—which it does not, Rule 60(c) required that the Secretary file a motion to dissolve the injunction *within a reasonable time* after the legal changes took place that he claims rendered the injunction no longer equitable. Never in the *18 months* that elapsed between April 2023 and October 2024 did the Secretary seek leave from this Court to be freed from his obligation to comply with the 2006 permanent injunction.[2]

At bottom, this Court should reject the Secretary's last-minute "ask forgiveness, not permission" approach to compliance with permanent injunctions from a federal court.

### B. The Secretary has failed to meet his burden to show that continued enforcement of the injunction is inequitable.

Even were it not so egregiously untimely, the Secretary's motion still fails on its merits. He insists the injunction is no longer equitable because "Ohio law no longer imposes disparate

---

[1] Ohio Legis. Servs. Comm'n, *Article V, Section 1*, https://codes.ohio.gov/ohio-constitution/section-5.1 (last accessed Oct. 28, 2024) ("Effective: 2022"); Ohio Legislature, House Bill 458, https://www.legislature.ohio.gov/legislation/134/hb458 (last accessed Oct. 28, 2024) ("Effective Date April 7, 2023").

[2] The Secretary also attempts to rationalize his eleventh-hour change to Form 10-U because this "is the first presidential general election since H.B. 458's voter identification provisions became effective." Opp. at 7. He neglects to mention that, since the two intervening events that he invokes have been in effect, Ohioans have voted in as many as *five* other elections, including the presidential primary. *See* Ohio Sec'y of State, *2023 Ohio Election Calendar*, https://www.ohiosos.gov/globalassets/publications/election/2023electionscalendar_11x17.pdf (last accessed Oct. 28, 2024); Ohio Sec'y of State, *2024 Ohio Election Calendar*, https://www.ohiosos.gov/globalassets/publications/election/2024electionscalendar_11x17.pdf (last accessed Oct. 28, 2024).

burdens on naturalized citizens." Opp. 10. Not so. No change in Ohio law alters the fact that the enjoined provisions the Secretary reimplemented disparately burden naturalized citizens. Lifting the injunction mere days before Election Day would *result* in inequities, not rectify them.

### 1. No change in Ohio law supports the injunction's dissolution.

Before a court can dissolve an injunction "to relieve inequities that arise after the original order," a movant must show that "significant changes in the law or circumstances" "threaten to convert a previously proper injunction into an instrument of wrong." *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 414 (6th Cir. 2012) (citations and quotations omitted). The Secretary has demonstrated nothing of the sort.

Instead, his musings about changes in Ohio law since 2006 amount to a comparison of apples to oranges. As an initial matter, changes in *Ohio* law do not control the contours of the *federal* constitutional provisions on which this Court's order was premised.[3] Moreover, the Secretary makes no argument that the Ohio legislature changed the state of play by amending the portions of the Ohio law that this Court enjoined. The enjoined law has *not* been repealed or amended—it reads the same as it did the day it was enjoined. Indeed, the Secretary cited (and cited *only*) this very law that was the subject of this Court's injunction as his authority to issue Revised Form 10-U. *See* ECF No. 53-1 at PageID 531.[4]

---

[3] The absence of any argument that *federal law* no longer justifies the injunction plainly distinguishes this case from *Sweeton v. Brown*, 27 F.3d 1162 (6th Cir. 1994) (en banc). *See* Opp. at 10. In *Sweeton*, the Sixth Circuit concluded that dissolving an injunction was proper where "decisional law had changed so that the enjoined behavior, which once *might* have been a violation of federal law, is no longer a matter of federal law at all." 27 F.3d at 1166. Here, the Secretary has not argued that any material change has taken place in the decisional law upon which this Court's permanent injunction rests.

[4] The lack of any change to the state law at issue distinguishes this case from *Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville & Davidson County*, 466 F.3d 391 (6th Cir. 2006). *See* Opp. 12. There, the district court dissolved an injunction prohibiting enforcement of an

The Secretary's attempt to suggest that changes in *other* Ohio laws have transformed this injunction into an instrument of wrong likewise fails. Contrary to the Secretary's representation, neither the 2022 amendment to the Ohio Constitution nor H.B. 458 created some scheme under which all Ohioans now face the burden of proving their citizenship before voting. Indeed, outside this litigation, the Secretary himself has complained that he *cannot* require voters to provide proof of citizenship. He has even asked the legislature for statutory changes to allow him to do so. In an August 2024 press release—more than a year after both H.B. 458 and the recent amendment to the Ohio Constitution had been in place—he represented that "state law does *not* currently allow the Secretary to require proof of citizenship." Ohio Sec'y of State, *Secretary LaRose Calls for Legislative Authority to Require Proof of Citizenship for Voter Registration* (Aug. 29, 2024), https://www.ohiosos.gov/media-center/press-releases/2024/2024-08-29/ (emphasis added); *see also* Ex. A, Letter from Sec'y LaRose to Hons. Huffman & Stephens (Aug. 29, 2024), https://perma.cc/4XKM-M4BN. The Secretary's representation in August 2024 that Ohio law does not authorize him to require documentary proof of citizenship to register—much less to vote at the polling place *after* having registered—is correct.

Now, in his opposition, the Secretary reverses position, and claims that an amendment to the Ohio Constitution and H.B. 458 authorize him to do what he so recently said he could not do. This time, he is wrong. Start with the constitutional amendment. Article V, Section 1 of the Ohio Constitution confirms what was already true under Ohio law: that being a citizen is one of the qualifications to vote in Ohio. *Compare* Ohio Const., Art. V, § 1, *with* R.C. §§ 3503.03(a),

---

ordinance because the municipality amended the challenged provision in a way that "is not overbroad and complies with the First Amendment," such that "the constitutional problems with the Ordinance had been rectified." *Deja Vu*, 466 F.3d at 394–95. *Deja Vu* does not support the Secretary's position here, where the unconstitutional provisions not only remain on the books in Ohio but were specifically cited by the Secretary in issuing Revised Form 10-U.

3599.12(A)(1). The amendment creates no new voter qualification. Nor does it impose any proof of qualification requirement. It does nothing to render this Court's injunction inequitable.

Next, look to Ohio H.B. 458. Among other unrelated provisions, the law made just two changes that relate in any way to citizenship. *First*, H.B. 458 limited the permissible forms of photo identification ("ID") that precinct election officials could accept at the polling place. R.C. § 3501.01(AA)(1); *see also id.* § 3505.18. Those permissible forms of photo ID do not include "limited term" (also known as "nonrenewable") driver's licenses, which are the only driver's licenses available to noncitizens who are "temporary residents" in the United States. *See id.* §§ 3501.01(BB), 4507.09. *Second*, H.B. 458 required that driver's licenses include a "noncitizen" notation if the licensee is a noncitizen. This notation requirement applies both to the "limited term," nonrenewable licenses available to noncitizens who are temporary U.S. residents (which H.B. 458 prohibits using at a polling place), and to the *renewable* licenses available to noncitizens who are permanent U.S. residents (which H.B. 458 authorizes using at a polling place). *Id.* § 4507.13(A)(2)(j); *see also id.* §§ 3501.01(AA)(1), 3501.01(BB), 3505.18.

If a permanent resident becomes a naturalized citizen and registers to vote any time *after* obtaining their renewable Ohio driver's license, nothing in H.B. 458 prevents that citizen from using an unexpired renewable license bearing a "noncitizen" identifier as an acceptable form of photo ID at their polling place. Even the Secretary agrees these IDs can be so used. When earlier this year the Secretary misinformed voters by stating on his website that naturalized citizens were prohibited from using such licenses at their polling places,[5] civic organizations requested

---

[5] The same letter that the Secretary implies he sent to protect naturalized citizens who he had reason to believe may still possess a license bearing a "noncitizen" notation as of August 2024 (*see* Opp. at 7; ECF No. 66-1 at PageID 597 ¶ 19) spread this same inaccurate information, stating that naturalized citizens "must avoid using any form of non-citizen identification to cast a ballot."

immediate correction. *See* Ex. B, Letter from F. Levenson, et al. to Sec'y LaRose (Oct. 17, 2024),

https://perma.cc/P54N-UZLQ. A day later, the Secretary corrected the website to say that licenses

with a "noncitizen" identifier "may be used" without providing a different form of acceptable

photo ID, Ohio Sec'y of State, *Identification Requirements*, https://www.ohiosos.gov/elections/

voters/id-requirements/ (last accessed Oct. 26, 2024). And he issued new guidance to boards of

elections confirming that H.B. 458 permits naturalized citizens to use an unexpired renewable

license bearing a "noncitizen" identifier as their photo ID without providing a different form of

acceptable photo ID. *See* ECF No. 66-1 at PageID 611–13.[6]

      H.B. 458 does not reference any proof beyond the permissible forms of identification that

any voter must provide to cast their ballot at their polling place. In particular, nothing in H.B. 458

requires documentary proof of citizenship at the polling place. Yet after being confronted about

his misinterpretation of H.B. 458 and acknowledging that naturalized citizens do not need to bring

an alternative form of H.B. 458-compliant photo ID to cast a regular ballot, he still insisted that

election officials subject naturalized citizens presenting these legally permissible licenses to the

---

ECF No. 66-1 at PageID 601. As explained *infra*, the Secretary has since recognized that this
admonition is inconsistent with H.B. 458. Moreover, because the letter pre-dated Revised Form
10-U, it does not even mention the Secretary's belated requirement that challenged voters must
provide documentary proof of citizenship at the polling place, warning only that "you *could* be
required to vote provisionally and appear in person at your county board of elections within four
days following Election Day to provide proof of citizenship." *Id.* (emphasis added).

[6] The Secretary's updated website and guidance purports to condition voters' use of renewable
licenses with "noncitizen" identifiers upon completion of Revised Form 10-U, but the Secretary's
made-up proof-of-citizenship requirement (which appears nowhere in H.B. 458) is wholly distinct
from the "photo identification" requirement that H.B. 458 actually does contain and that the
Secretary concedes these licenses satisfy, not least because the invented proof-of-citizenship
requirement can be satisfied using documents that do *not* constitute acceptable forms of photo ID
under H.B. 458. *Compare* ECF No. 66-1 at PageID 611–12 (providing that a "Certificate of
Citizenship" or "Certificate of Naturalization" would suffice as proof of citizenship), *with*
R.C. § 3501.01(AA) ("certificate of citizenship" and "certificate of naturalization" are not
enumerated amongst the permissible forms of "photo identification").

very same set of questions and demands for proof that this Court enjoined in 2006. The change in the Secretary's guidance makes clear that nothing in H.B. 458 (or the Ohio Constitution) authorizes him to take the extra step of verifying citizenship, much less in the precise manner this Court had already enjoined—he just chose to reimplement the enjoined statutory provisions on his own.

Even if either change in Ohio law were somehow construed as requiring the Secretary to confirm voters' citizenship before they cast their vote (on their face, they do not): the previous versions of Form 10-U, which complied with this Court's injunction, provided a permissible means to do just that. The version of Form 10-U that was in place before October 2024 required challenged voters to swear under oath, subject to penalty for election falsification, that they are citizens. That approach enabled election officials to confirm a voter's citizenship without subjecting naturalized citizens to disparate treatment in exercising the right to vote. Neither H.B. 458 nor the constitutional amendment authorizes or even suggests any different means of testing naturalized voters' citizenship—and certainly not the *specific means this Court already enjoined.*

All available evidence, including the Secretary's own statements, indicate that the previous approach to confirming the citizenship of people voting in Ohio's elections was sufficient. Most recently, the Secretary characterized the 2024 primary election—which took place *before* Revised Form 10-U was issued, and *after* the changes in state law that the Secretary invokes in his opposition—as "a secure and accessible election." Ohio Sec'y of State, *Secretary LaRose Certifies Results of the 2024 Primary Election* (Apr. 19, 2024), https://www.ohiosos.gov/media-center/press-releases/2024/2024-04-19a/. The Secretary found no need to change Form 10-U before these elections took place without incident. Indeed, after a far-reaching inquiry covering elections spanning nearly two decades, Ohio's Attorney General announced indictments this month, against just six individuals for allegedly voting illegally as noncitizens in elections from

8

2008 to 2020. Ohio Attorney General, *Grand Juries Indict 6 for Illegal Voting* (Oct. 22, 2024), https://www.ohioattorneygeneral.gov/Media/News-Releases/October-2024/Grand-Juries-Indict-6-for-Illegal-Voting. To be sure, no voter-registration system is perfect, but this comes awfully close to complete deterrence: As the Attorney General acknowledged, "[i]rregularities are rare, and this is a small number of cases." *Id.* Rare, indeed: nearly 23 million votes have been cast in general presidential elections in Ohio since 2008.[7] Those allegedly illegal votes comprise an infinitesimal fraction of ballots cast. In violating this Court's order, the Secretary has reinstated unnecessary burdens on naturalized citizens to address a near-nonexistent issue. The Secretary has provided no reason to believe that continued enforcement of the injunction and use of the prior version of Form 10-U for citizenship challenges would create any inequities.

> **2.  Neither Revised Form 10-U nor the Secretary's guidance to election officials provides any assurance against the abuses this Court's injunction sought to prevent.**

Neither the text of Revised Form 10-U nor the Secretary's "guidance" protects naturalized citizens from the discriminatory burdens that this Court sought to prevent. To start, neither the Secretary's guidance nor Revised Form 10-F itself reflect changes made by statute, nor do they have any other sense of permanence. Because any Secretary of State could withdraw the guidance or modify the form at any time, such temporary representations cannot justify dissolving this Court's permanent injunction. And importantly, even *in their current form*, neither the guidance nor Revised Form 10-U provides any support for dissolving this Court's injunction.

In his opposition, the Secretary asserts that he issued guidance to boards of elections on

---

[7] According to the Secretary's data, turnout for the 2008 presidential general election was 5,773,777; 2012 was 5,634,017; 2016 was 5,607,641; and 2020 was 5,974,121.  Ohio Sec'y of State, *Election Results and Data*, https://www.ohiosos.gov/elections/election-results-and-data/ (last accessed Oct. 28, 2024).

Ohio's new citizenship and photo ID requirements, and that per this guidance, "[o]*nly* persons who specifically present a form of identification with a 'noncitizen' designation or otherwise unauthorized form of photo identification are required to present additional proof of citizenship." Opp. at 8 (emphasis added). The Secretary's brief goes even further, representing that the "Secretary's email clarified that citizenship-based challenges—and the corresponding use of Form 10-U—will occur if and only if an individual presents a noncitizen identification," citing "Ex. A-3." Opp. at 9. He claims that his guidance limits citizenship challenges to just this one circumstance, and that he has "circumscribed [the] discretion" election officials would otherwise have to "challenge the qualifications of an individual who is voting in person" under Ohio law and curbed the discriminatory uses of Form 10-U that this Court's injunction sought to prevent.

But claiming this doesn't make it so. Revised Form 10-U—and the instructions for its use—are manifestly designed to be used for all citizenship challenges. *Nothing* in the guidance issued by the Secretary or the text of Revised Form 10-U itself reflects any of the limitations claimed in the Secretary's briefing.

The Secretary gave this Court copies of two emails he asserts provided guidance to board of elections about the Revised Form 10-U. The first email is guidance the Secretary's office sent to the boards of elections on October 2, 2024, with the Revised Form 10-U attached. ECF No. 66-1 at PageID 606–09. The second is an email sent on October 18, 2024—nine days into early voting. ECF No. 66-1 at PageID 611–13. The guidance that actually appears in these emails is deeply inconsistent with the Secretary's descriptions in his opposition brief.

The first guidance email states that the Secretary is providing the Revised Form-U "to clarify the challenge process at polling locations," given the "questions on the process for challenging a voter's eligibility both before and on Election Day" that the Secretary and boards of

elections had received. The email also asks the boards of elections to "please note" that naturalized citizens may still possess an Ohio driver's license bearing a "noncitizen" notation, and indicates that naturalized citizens "must provide other acceptable forms of photo identification to be able to cast a ballot." (As explained *supra*, this is the same incorrect statement about H.B. 458's requirements that the Secretary ultimately retracted from his website.) And the email states that the purpose of the Revised Form 10-U is to provide "clear guidance on challenging a voter based on citizenship status, as well as the documentation needed to either allow them to vote a regular ballot or require them to vote a provisional ballot." ECF No. 66-1 at PageID 606.

The second guidance email reflects the change that the Secretary made to his website after civic organizations sought clarification about his misstatement. The guidance no longer states that naturalized citizens with an Ohio driver's license bearing a "noncitizen" notation must provide an alternate form of photo ID, but instead asserts that if the ID is "otherwise valid and unexpired," the precinct election official should use Revised Form 10-U to "verify the voter's citizenship qualifications." ECF No. 66-1 at PageID 611–12.

While each guidance email discusses *one* reason to initiate a challenge using Revised Form 10-U—when a voter presents a license bearing a "noncitizen" identifier—neither states or even remotely suggests that the *only* reason to mount a citizenship challenge under Revised Form 10-U is a "noncitizen" identifier on the voter's photo ID. Nor does either email contain any statements that purport to cabin election officials' use of Revised Form 10-U for citizenship challenges made on other bases. Because all previous versions of Form 10-U have been the mechanism for *all* citizenship challenges (as well as for all age and residency challenges) for decades in Ohio, this major change would have been pointed out clearly—not omitted entirely.

Nor does Revised Form 10-U itself contain any language or guidance reflecting any such

limitation. Section (A) of Revised Form 10-U addresses the process for when a person is "challenged as unqualified on the grounds that . . . [t]he person is not a citizen." It asks the four questions outlined herein and requires the challenged person to provide documentation to prove their citizenship—citing the very statute that was the subject of the injunction as support for doing so—and then states that "[i]f the person declares under oath and provides the required documentation and photo identification proving their citizenship, they may vote a regular ballot." ECF No. 66-1 at PageID 607. Nowhere does Revised Form 10-U state that *only* individuals who present a license with a noncitizen identifier may be challenged.[8]

The Court should not accept the Secretary's ungrounded assertion, contrary to all evidence, that Revised Form 10-U's scope is so limited. The Secretary's own briefing admits Form 10-U is ordinarily used when a voter is challenged for any reason, not solely in conjunction with this late-breaking guidance. Opp. at 7–8; *id.* at 9 (conceding how Form 10-U is "generally used" in a way that affords election officials discretion). Just as in 2006, the Secretary has failed to issue any directive or other guidance limiting the scope of this generally applicable challenge form or making clear that the already-enjoined questions cannot be used to probe a voter's appearance, name,

---

[8] The Secretary's opposition also cites to the Affidavit of Chris Burnett as support for the proposition that the Secretary has "circumscribed [the] discretion" that election officials would otherwise have to "challenge the qualifications of an individual who is voting in person" under Ohio law. Opp. 8–9 (citing Burnett Aff. ¶ 25). To start, Mr. Burnett's affidavit was not itself guidance issued to election officials; it was created for use in this litigation. More importantly, nowhere in his affidavit does Mr. Burnett ever state that the Secretary has limited the discretion that election officials have under R.C. § 3505.20, or that election officials have been instructed to challenge voters on the grounds of citizenship *only* if the voter presents photo ID bearing the "noncitizen" identifier. In full, paragraph 25 of Mr. Burnett's declaration reads as follows: "The Secretary's Office created Form 10-U for an election official to use if he or she challenges the qualifications of an individual who is voting in person. Form 10-U serves as a fact-based tool for election officials to verify a voter's qualifications. A true and accurate copy of Form 10-U, as in effect prior to October 2, 2024, is attached hereto as Exhibit A-2." ECF No. 66-1 at PageID 597 ¶ 25. Neither that paragraph nor anything else in Mr. Burnett's affidavit discusses any limitation on the types of challenges that can be brought.

12

looks, accent or manner at an election official's discretion. *See* ECF No. 20 at PageID 260.

This all goes to show that, contrary to the Secretary's representations to this court, Revised Form 10-U was designed as, and remains, the vehicle used for all citizenship challenges. Dissolving the injunction and allowing the Secretary to reinstate the enjoined provisions of Section 3505.20 would relegate naturalized citizens in Ohio back to the precise situation that they were in prior to the issuance of the injunction—the "second-class citizenship" status that this Court concluded was both unconstitutional and shameful. ECF No. 20 at PageID 260–61.

Even if the Court accepted the Secretary's position that his current guidance ensures that the enjoined requirements imposed by Revised Form 10-U can be applied *only* to voters whose license contains a "noncitizen" identifier (and the Court should not, for the reasons explained above)—that only makes the problem with dissolving the Court's injunction clearer. Contrary to other aspects of Ohio law that require native and naturalized citizens to undertake the *same* burdens,[9] the Secretary is expressly admitting that *only naturalized citizens*—those whose IDs indicate they were previously noncitizens, but who had become citizens by the time they appeared to vote—could be required to provide further proof of their qualifications at the polls. In contrast, native citizens would never be asked to take on these additional burdens before they may cast a ballot at their polling place. Note, for example, that the Secretary's guidance to election officials

---

[9] For example, under longstanding Ohio and federal law, both of which are consistent with Ohio's more recent constitutional amendment, all voters—whether native or naturalized citizens—must attest to their citizenship when they register to vote. *See, e.g.*, 52 U.S.C. § 20504(c)(2)(C) (requiring that voter-registration portion of application for state driver's license: (i) states each eligibility requirement, including citizenship; (ii) contains attestation that applicant meets each such requirement; and (iii) requires applicant's signature, under penalty of perjury); R.C. § 3503.20(A)(2), (D)(3) (online voter registration applicants must attest they are citizens under penalty of election falsification); Ohio Sec'y of State, *Voter Registration and Information Update Form*, https://www.ohiosos.gov/globalassets/elections/forms/vr_form_english.pdf (last accessed Oct. 26, 2024) (requiring applicants to "declare under penalty of election falsification" that they are "a citizen of the United States").

never conceives of a scenario where a native citizen would be required to carry their birth certificate to the polls for impromptu verification. And the Secretary's opposition does not call into question what the record in this case (and on which this Court's injunction was founded) established: Naturalized citizens do not carry around bulky certificates of naturalization. Many don't even have them. And replacing them costs hundreds of dollars and takes years. The many concerns this Court identified in its 2006 opinion apply with equal force now. ECF No. 20 at PageID 256–61. In other words, the Secretary's own attempt to (mis)construe his conduct in a favorable light *still* subjects naturalized citizens alone to the "second-class citizen" status and disenfranchisement that this Court's injunction sought to avoid.

### 3. All equitable considerations weigh strongly *against* dissolving the injunction, especially now.

On the equities, the Secretary has it backwards. Granting the Secretary's motion for dissolution of the permanent injunction, brought only after and in response to Plaintiffs' emergency motion to enforce that injunction because of his election-eve violation, would turn Rule 60(b) on its head. Without Plaintiffs' diligence in seeking continued enforcement of the injunction this Court granted in 2006, the Secretary may have well continued to flout the injunction, undetected. "[D]istrict courts should not use their authority under Rule 60(b) to reward parties' contempt of prior orders." *Pauley*, 321 F.3d at 581.

The equities in the context of an election weigh especially *against* the Secretary's eleventh-hour ask to change the law to avoid contempt. With no apparent effort to educate voters—who stand to be gravely impacted—the Secretary issued Revised Form 10-U just days before the start of early voting in Ohio, and now asks this court to reward his defiance of the injunction by changing federal law on the eve of an election to match his preferences. Established equitable

doctrines foreclose the Secretary's belated ask for this Court to unsettle longstanding federal law during an ongoing election. *See Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006).

Consistent with the Sixth Circuit's strong constraint on the availability of relief under Rule 60(b) because of "public policy favoring finality of judgments," *Waifersong, Ltd. Inc. v. Classic Music Vending*, 976 F.2d 290, 292 (6th Cir. 1992), this Court should protect Plaintiffs' rights and preserve the finality of its judgment by enforcing the permanent injunction entered in this case in 2006 (which the Secretary never appealed) and finding the Secretary in civil contempt.

## CONCLUSION

This Court should compel the Secretary to comply with this Court's previous injunction and revert to the prior, compliant version of Part (A) of Form 10-U in use prior to October 2024, by enforcing the order that this Court issued on October 4, 2006. As the Court then said:

> There is no such thing as a second-class citizen or a second-class American. Frankly, without naturalized citizens, there would be no America. It is shameful to imagine that this statute is an example of how the State of Ohio says "thank you" to those who helped build this country.

ECF No. 20 at PageID 260.

Date: October 28, 2024

Respectfully submitted,

/s/ Freda J. Levenson
Freda J. Levenson (0045916)

Megan C. Keenan*
Sarah Brannon*
American Civil Liberties Union Foundation
915 15th St. NW
Washington, DC 20005
(740) 632-0671
mkeenan@aclu.org
sbrannon@aclu.org

ACLU OF OHIO FOUNDATION, INC.
4506 Chester Avenue
Cleveland, OH 44103
(216) 541-1376
flevenson@acluohio.org

Subodh Chandra (0069233)
The Chandra Law Building
1265 W. 6th St., Ste. 400
Cleveland, OH 44113
216.578.1700 (Phone)

Sophia Lin Lakin**
American Civil Liberties Union Foundation
125 Broad St., 18th Floor
New York, NY 10004

(212) 549-2500                                    216.578.1800 (Fax)
slakin@aclu.org                                   Subodh.Chandra@ChandraLaw.com

Jen Samantha D. Rasay*
Alice Clapman*                                    *Admitted *pro hac vice*
Brennan Center for Justice                        **Motion to appear *pro hac vice* forthcoming
at NYU School of Law
1140 Connecticut Avenue, Ste. 1150
Washington, DC 20036
(202) 249-7190
rasayj@brennan.law.nyu.edu
clapmana@brennan.law.nyu.edu

## <u>CERTIFICATE OF SERVICE</u>

I, Freda Levenson, an attorney admitted to practice before this Court, hereby certify that on October 28, 2024, the foregoing Reply was filed with the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties for whom counsel has entered an appearance. The parties may access this filing through the Court's electronic filing system.

Date: October 28, 2024                              Respectfully submitted,


                                                   */s/ Freda J. Levenson*
                                                   Freda J. Levenson (Bar. No. 0045916)
                                                   ACLU OF OHIO FOUNDATION, INC.
                                                   4506 Chester Avenue
                                                   Cleveland, OH 44103
                                                   (216) 541-1376
                                                   flevenson@acluohio.org

EXHIBIT A



August 29, 2024


Honorable Matt Huffman
President, Ohio Senate
Ohio Statehouse
Columbus, Ohio 43215


Honorable Jason Stephens
Speaker, Ohio House of Representatives
77 South High Street, 14th Floor
Columbus, Ohio 43215


Re: Potential Election Legislation

Dear President Huffman and Speaker Stephens,

I write to make you aware of three policy matters that have recently come to light. To ensure the ongoing integrity of Ohio's elections, I suggest urgent legislative attention to each of them.

1. A federal court's decision in a recent case impacts Ohio's ban on ballot harvesting, likely requiring a re-examination of voting assistance protocols and the security of drop boxes.
2. A new decision by the Supreme Court of the United States gives us an opportunity to better enforce Ohio's constitutional citizenship requirement for participating in elections.
3. The General Assembly should consider adopting a new provisional ballot voting requirement for voters with mismatched registration records.

**Protecting Ohio's Election Integrity**


First, a federal court's recent decision in a lawsuit brought by the League of Women Voters ("the LWV") impacts Ohio's prohibition on ballot harvesting. Although the decision is limited in scope, it could nonetheless have a broader effect on ballot security.

The LWV sought to challenge certain provisions of House Bill 458, adopted by the General Assembly and signed into law by the Governor in 2023. While the court declined to act on most of the LWV's claims, it issued an order limited in scope to disabled voters who wish to utilize someone other than a relative as defined by R.C. 3509.05 to assist them with the return of an absentee ballot. Specifically, the court prohibited the state from administering, implementing, or enforcing R.C. 3599.21(A)(9) and (A)(10) "against any disabled voter or against any individual who assists any disabled voter."[1]

---

[1] *See* Op. at 38, 42

The law adopted by the General Assembly in 2023 defined the type of person legally eligible to assist a voter with the return of an absentee ballot as either a qualified relative or a mail carrier. The court determined that this restriction violates Section 208 of the federal Voting Rights Act, which allows a disabled voter to be assisted by "a person of the voter's choice." Unfortunately, this decision does not provide relief to a family who believes their disabled relative is receiving ballot assistance without their knowledge, approval, or input, or who may have been coerced or misguided by individuals attempting to "assist" their voting decisions.

The court's decision is limited in scope. However, it highlights a need for additional steps to enforce Ohio's ban on ballot harvesting. Without the appropriate safeguards, a person could return any number of ballots to an unattended drop box simply by claiming (whether truthfully or not) the permissive authority granted under Section 208. This effectively creates an unintended loophole in Ohio's ballot harvesting law that we must address. I suspect this is exactly the outcome the LWV intended. Under the guise of assisting the disabled, their legal strategy seeks to make Ohio's elections less secure and more vulnerable to cheating, especially as it relates to the use of drop boxes. The security of the delivery of absentee ballots remains paramount, so this leaves us with the obvious question of a remedy.

Pending legislative action to address enforcement of Ohio's prohibition on ballot harvesting I will direct boards to post a notification on each drop box indicating that voter-assisted ballots must be returned inside the board office, where the voter assistant will be asked to complete an attestation form confirming that they are complying with applicable state or federal law. This effectively means ONLY A VOTER'S PERSONAL BALLOT may be returned via drop box. I am acting under my statutory authority to compel the observance of election laws (*see* R.C. 3501.05), in this case Ohio's ban on ballot harvesting. However, I strongly encourage you to consider codifying any additional safeguards that might be necessary due to attempts to erode the integrity of our elections, including possibly banning drop boxes as a result of this court decision which makes it harder to guard against ballot harvesting.

### Enforcing Ohio's Citizenship Requirement

Second, the Supreme Court of the United States granted last week a request by Arizona's Republican legislative leaders and the Republican National Committee to reinstate a law requiring proof of citizenship to register to vote. The court's decision limits the application of the law only to voter registration forms prescribed by the state, but this ruling effectively gives the Ohio General Assembly the option to adopt a similar requirement. I recommend that we do so. As the prescriptive authority for election-related forms in Ohio, I ask that you consider codifying a proof of citizenship requirement that can be incorporated into the state-issued voter registration applications prescribed by my office. I also propose the addition of a clearly disclaimed warning that states: "The Ohio Constitution prohibits a noncitizen of the United States from registering and voting at any state or local election held in this state. It is illegal for a noncitizen to register and vote in Ohio." Unfortunately, the court's order does not preclude use of a longstanding federally-prescribed voter registration form that does not require proof of citizenship, so this remedy is not infallible; however, any incremental step we can take in the adoption of election integrity safeguards is a step worth taking. Upon the General Assembly's action, I will immediately require front-end citizenship verification for all state-prescribed forms, and I will

direct all boards of elections to add additional steps to check citizenship status for registrants using the federally-prescribed form.

My office just conducted the most comprehensive citizenship verification audit ever performed on Ohio's voter rolls. We have expanded our review of citizenship records provided by the Ohio Bureau of Motor Vehicles and obtained access to the Department of Homeland Security's (DHS) federal Systematic Alien Verification for Entitlements (SAVE) database, which allows government agencies to check citizenship status more effectively. We are working to implement more extensive cross-checks of Social Security Administration records, federal jury pool data, and citizenship records maintained by the justice system. Additionally, my office has asked the Biden-Harris administration to grant access to the Person Centric Query System (PCQS) database, the Person Centric Identity Services database, and the Central Index System 2, also maintained by DHS. I am currently preparing to take legal action to compel the administration to follow the law and make these resources available as our requests continue to go unanswered. Our latest investigation resulted in the recent referral of 597 individuals who registered to vote in Ohio despite not being citizens of the United States, including evidence that 138 of those registrants also cast a ballot. Our citizenship audit is ongoing as we acquire new data. Adopting a proof-of-citizenship requirement on the front end of the registration process would help to reduce our current reliance on these back-end election integrity efforts.

## Ensuring the Accuracy of Ohio's Voter Rolls

Finally, I ask that the General Assembly consider codifying a new provisional voting requirement for individuals who provide inaccurate information on a voter registration application. The DATA Act, which became law in 2023, gave my office the authority to conduct more extensive audits and analysis of election data. In compliance with state law, our Office of Data Analytics and Archives has identified numerous voter registration applications containing mismatched data, which differs from information on file with the Bureau of Motor Vehicles or the Social Security Administration (BMV/SSA).

These mismatched voter registration applications are flagged and sent to the relevant county board of elections, which then sends the voter a notice asking that the mismatched information be corrected. If the voter fails to respond and engages in no voter-initiated activity for a specified period, the registration is removed from the rolls. The problem here is what happens when a voter with a mismatched registration record *does* engage in voter-initiated activity while the record is under review. Current law requires that a voter in confirmation status be returned to "active" status upon engaging in a voter-initiated activity, meaning the mismatched record never gets corrected. This leads to inaccurate data on Ohio's voter rolls and erodes public confidence in the integrity of our elections. Further, it complicates our statutory requirement "to ensure that the accuracy of the statewide voter registration database is maintained on a regular basis in accordance with applicable state and federal law" and prevents us from ensuring that individuals who are not eligible to vote are promptly removed from the database. (*See* R.C. 3503.151)

As Ohio's chief election official, I propose adding a statutory mandate that any voter whose registration requires the reconciliation of mismatched data be required to cast a provisional ballot. This forces the voter to cure any mismatched information before a ballot can be counted.

To be clear, the voter registration would not be canceled but rather placed in a "provisional confirmation" status for further action. This approach mirrors current law regarding an unverified voter address. The board of elections sends an acknowledgment notice to new registrants confirming the registration and assigning a voting location. If the notice is returned by USPS as undeliverable, the board must place the registration in confirmation status, and the voter must either correct the mismatched information on file or cast a provisional ballot and correct the information through the cure process. The provisional confirmation status would follow a similar process. This change is essential to maintaining the accuracy of our voter rolls and ensuring the integrity of our elections.

Thank you for the vital role you play in ensuring that Ohio elections are secure, accurate, and accessible. While it may be unrealistic to accomplish these reforms before the upcoming election, they are nonetheless changes that should be considered as soon as possible.  In the meantime, as we hope for legislative action as quickly as practicable, we will work with the boards of elections to mitigate each of these concerns to the best of our ability within the current authorities given to us by the Revised Code and the Ohio Constitution. As always, I stand ready to assist you in any way with enactment of these reforms. Consider my office a resource as we continue to build on Ohio's national reputation as "the gold standard" of election administration.

Yours in service,

Frank LaRose
Ohio Secretary of State

cc:     John Barron, Chief of Staff, Ohio Senate
        Matt Oyster, Chief Legal Counsel, Ohio Senate
        Brittney Colvin, Chief of Staff, Ohio House of Representatives
        Heather Blessing, Deputy Chief Legal Counsel, Ohio House of Representatives

# EXHIBIT B





October 17, 2024

*Via email and U.S. Mail*

Frank LaRose
Ohio Secretary of State
180 Civic Center Drive
Columbus, OH 43215
flarose@ohiosos.gov

Dear Secretary LaRose:

We are writing to call your attention to an urgent problem. Specifically, we write with regard to the instruction on your website[1] prohibiting the use of driver's licenses bearing "noncitizen" notations as voter ID. You state that "Ohio NONCITIZEN IDENTIFICATION, also known as Non Renewable/Non Transferable credential" is an unacceptable form of voter ID. Your instruction is incorrect. While pursuant to Ohio H.B. 458, a "nonrenewable" driver's license is not acceptable as voter ID, a license bearing a "noncitizen" notation is *not* the same thing.

As explained below, a "noncitizen" notation does not render an Ohio driver's license an unacceptable voter ID. Because it is not always possible for a naturalized citizen to quickly update their license, naturalized citizens may indeed have a "noncitizen" notation on their current drivers' license. Your incorrect instructions are thus putting the voting rights of some individuals at risk.

---

[1] *See* Ohio Sec'y of State, Identification requirements, https://www.ohiosos.gov/elections/voters/id-requirements, (which says "Ohio Noncitizen Identification", and Ohio Sec'y of State, Examples of Unacceptable Forms of Identification, https://www.ohiosos.gov/globalassets/elections/eoresources/pol-loc-resources/unacceptable_id_poster.pdf. Neither of these documents provide any clarification that permanent residents would have this "noncitizen" notation on their ID but do not have a nonrenewable driver's license.

In addition to posting this incorrect instruction on your website, you provided the same incorrect instruction to local boards of elections in Directive 2024-09.[2] We request that you immediately correct your website and provide immediate notification to all local boards that a person with a renewable driver's license (which if the holder is a recently naturalized citizen, still may bear a "noncitizen" notation) must be permitted to use that license as their voter ID. Since early voting is underway, these corrective actions must be taken immediately.

## H.B. 458 REQUIREMENTS

H.B. 458 prohibits the use of a *nonrenewable* driver's license for voter ID purposes.

Prior to H.B. 458, there were no citizenship markings on driver's licenses. H.B. 458 now requires that driver's licenses include a "noncitizen" notation if the licensee is a noncitizen (e.g., a temporary or permanent resident). R.C. 4507.13(A)(2)(j). This notation appears on the back of the license. Here is how it looks (see upper right quadrant):



H.B. 458 also amended the types of acceptable ID for voting, in part by redefining "driver's license" to include all driver's licenses issued under Chapters 4506 and 4507 of the Revised Code, except for nonrenewable licenses issued under R.C. 4507.09. *See* R.C. 3501.01(BB). Such nonrenewable licenses are issued *only* to temporary residents—they are not issued to permanent residents or U.S. citizens. R.C. 4507.09 and O.A.C. 4501:1-1-37. In

---

[2] Ohio Sec'y of State, Directive 2024-09 (June 21, 2024), https://www.ohiosos.gov/globalassets/elections/directives/2024/directive-2024-09-november-readiness-election-administration.pdf. This document merely explains to election officials that the "noncitizen" notation has been added to driver's licenses but does not provide any guidance about the correct application of the new provisions of H.B 458.

contrast, permanent residents are issued the same license as U.S. citizens who are Ohio residents; but now, under H.B. 458, these licenses have a "noncitizen" notation.[3]

As a result, a "noncitizen" notation will be found on both:

1) A nonrenewable driver's license for a temporary resident, which is a prohibited form of voter ID; and
2) A driver's license for a permanent resident, which is *not* a nonrenewable license and therefore is *not* a prohibited form of voter ID.

Thus, a "noncitizen" notation on the back of a license cannot tell you whether the license is renewable (and permissible to use as voter ID) or nonrenewable (and impermissible to use as voter ID). One must look instead at the *front* of the license to see whether or not it is "nonrenewable". Here is how a "nonrenewable" designation appears on a license (see upper right quadrant):



**SECRETARY OF STATE INSTRUCTIONS**

The instructions on your website and Directive 2024-09 incorrectly advise naturalized citizens who still possess unexpired driver's licenses with a "noncitizen" notation that they cannot use their license as voter ID. But the law does not prohibit a naturalized citizen who is registered to vote from using a license they received as a permanent resident, even if that license is marked "noncitizen."

---

[3] *See* O.A.C. 4501:1-1-35 and 1-1-37; *see also* Ohio Bureau of Motor Vehicles, Driver License & ID Cards for Non-U.S. Citizens, https://www.bmv.ohio.gov/dl-non-permanent-resident.aspx, and H.B. 458, Final Analysis, 11, 134th General Assembly (Apr. 7, 2023).

To reiterate, the "noncitizen" notation is *not* the determinative factor of whether a driver's license is an acceptable form of voter ID; rather, the determinative factor is *only* whether the license is marked "NONRENEWABLE/NONTRANSFERABLE."

Please **immediately** correct your incorrect instruction on your website and Directive 2024-09 and instruct boards of election to make it clear (1) that the *only* type of unacceptable driver's license is one marked "NONRENEWABLE/NONTRANSFERABLE" on its face, and (2) that the "noncitizen" notation on the back of the license should be disregarded as immaterial.

Please do not hesitate to contact us if you have any questions.

Sincerely,

/s/ Freda J. Levenson
Freda J. Levenson
AMERICAN CIVIL LIBERTIES UNION OF OHIO
FOUNDATION
4506 Chester Avenue
Cleveland, OH 44103
flevenson@acluohio.org
(216) 541-1376

/s/ Sarah Brannon
Sarah Brannon
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW
Washington, DC 20005
sbrannon@aclu.org
(202) 210-7287

/s/ Jen Miller
Jen Miller
LEAGUE OF WOMEN VOTERS OF OHIO
471 E Broad Street, Suite 1630
Columbus, OH 43215
director@lwvohio.org
(614) 469-1505

/s/ Alice Clapman
Alice Clapman
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
1140 Connecticut Avenue NW
Suite 1150
Washington, DC 20036
clapmana@brennan.law.nyu.edu
(202) 249-7190

/s/ Kayla Griffin Green
Kayla Griffin Green
ALL VOTING IS LOCAL
PO Box 33727
Washington, DC 20033
kayla@allvotingislocal.org
(330) 402-2427

/s/ Kelly Dufour
Kelly Dufour
COMMON CAUSE OHIO
PO Box 20799
Columbus, OH 43220
kdufour@commoncause.org
(614) 285-6019